# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## Nos. 17-1895(L), 17-1952

### SIERRA CLUB,

**Plaintiff/Appellee-Cross-Appellant,**

**v.**

### VIRGINIA ELECTRIC & POWER COMPANY,
#### d/b/a Dominion Energy Virginia,

**Defendant/Appellant-Cross-Appellee.**

On Appeal from the United States District Court
for the Eastern District of Virginia, Richmond Division

## BRIEF OF *AMICI CURIAE* VIRGINIA CHAMBER OF COMMERCE, VIRGINIA MANUFACTURERS ASSOCIATION, EDISON ELECTRIC INSTITUTE, UTILITY WATER ACT GROUP, AND UTILITY SOLID WASTE ACTIVITIES GROUP IN SUPPORT OF DEFENDANT/APPELLANT-CROSS-APPELLEE AND REVERSAL

Kristy A. N. Bulleit
Hunton & Williams LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037-1701
(202) 955-1500
kbulleit@hunton.com

Michael R. Shebelskie
Hunton & Williams LLP
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200
mshebelskie@hunton.com

Counsel for *Amici Curiae* Virginia Chamber of Commerce,
Virginia Manufacturers Association, Edison Electric Institute, and
Utility Water Act Group

(additional counsel on inside cover)

Douglas H. Green
John F. Cooney
Margaret K. Fawal
Venable LLP
600 Massachusetts Ave.
Washington, DC 20001
(202) 344-4000
jfcooney@venable.com

Counsel for *Amicus Curiae*
Utility Solid Waste Activities Group

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1895(L), 17-1952   Caption: Sierra Club v. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Pursuant to FRAP 26.1 and Local Rule 26.1,

Virginia Chamber of Commerce
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐ YES ☐ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Michael R. Shebelskie          Date: September 20, 2017

Counsel for: Virginia Chamber of Commerce

## CERTIFICATE OF SERVICE
***************************

I certify that on September 20, 2017 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Michael R. Shebelskie                     September 20, 2017
        (signature)                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  17-1895(L), 17-1952      Caption: Sierra Club v. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Pursuant to FRAP 26.1 and Local Rule 26.1,

Virginia Manufacturers Association
(name of party/amicus)

who is _____ amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

09/29/2016 SCC                           - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Michael R. Shebelskie             Date:   September 20, 2017

Counsel for: Virginia Manufacturers Association

## CERTIFICATE OF SERVICE
****************************

I certify that on  September 20, 2017   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Michael R. Shebelskie                           September 20, 2017
          (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1895(L), 17-1952    Caption: Sierra Club v. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Pursuant to FRAP 26.1 and Local Rule 26.1,

Edison Electric Institute
(name of party/amicus)

_____

who is _____amicus_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

09/29/2016 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☐ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Michael R. Shebelskie          Date:  September 20, 2017

Counsel for: Edison Electric Institute

## CERTIFICATE OF SERVICE
****************************

I certify that on  September 20, 2017  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Michael R. Shebelskie                           September 20, 2017
          (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1895(L), 17-1952   Caption: Sierra Club v. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Pursuant to FRAP 26.1 and Local Rule 26.1,

Utility Water Act Group
(name of party/amicus)

who is _____ amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☐ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Michael R. Shebelskie_____     Date: __September 20, 2017__

Counsel for: _Utility Water Act Group_____

## CERTIFICATE OF SERVICE
***************************

I certify that on __September 20, 2017__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_/s/ Michael R. Shebelskie_____                  _____September 20, 2017_____
      (signature)                                          (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1895(L), 17-1952    Caption: Sierra Club v. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Pursuant to FRAP 26.1 and Local Rule 26.1,

Utility Solid Waste Activities Group
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

09/29/2016 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☐ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                          ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ John F. Cooney _____     Date: _____ September 20, 2017 _____

Counsel for: Utility Solid Waste Activities Group _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _September 20, 2017_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ John F. Cooney _____              _____ September 20, 2017 _____
        (signature)                                        (date)

- 2 -

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

*AMICI CURIAE'S* INTEREST ................................................................. 1

ARGUMENT ......................................................................................... 3

I.    THE DISTRICT COURT MISAPPLIED THE CWA'S BAN ON
      DISCHARGES OF POLLUTANTS FROM POINT SOURCES .................. 4

II.   THE DISTRICT COURT ERRONEOUSLY RELIED ON ONE OF
      THE CWA'S PURPOSES TO EXCEED §402'S SCOPE........................... 11

III.  DISCHARGES TO GROUNDWATER ARE SUBJECT TO MANY
      OTHER ENVIRONMENTAL PROTECTIONS ......................................... 14

IV.   EPA INTERPRETED CWA §402 NOT TO APPLY TO
      HYDROLOGICALLY CONNECTED GROUNDWATER........................ 18

V.    THE DISTRICT COURT'S DECISION UNFAIRLY BURDENS
      THE REGULATED PUBLIC.......................................................... 23

      A.    Dischargers lack certainty whether they need NPDES permits ......... 23

      B.    NPDES permit holders could be sanctioned through no fault of
            their own ........................................................................... 26

      C.    Businesses and localities that relied on EPA will be penalized ......... 29

CONCLUSION ..................................................................................... 30

CERTIFICATION OF COMPLIANCE ................................................. 32

CERTIFICATE OF SERVICE................................................................. 33

# TABLE OF AUTHORITIES

**Page**

### Cases

*26 Crown Assocs., LLC v. Greater New Haven Reg'l Water Pollution
Control Auth.*, No. 3:14-CV-1439,
2017 WL 2960506 (D. Conn. July 11, 2017) ................................. 6, 11

*Appalachian Power Co. v. Train,*
545 F.2d 1351 (4th Cir. 1976)........................................................ 4, 12

*Bankamerica Corp. v. U.S,*
462 U.S. 122 (1983) ............................................................................ 23

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,*
273 F.3d 481 (2d Cir. 2001).............................................................. 14

*Christensen v. Harris County,*
529 U.S. 576 (2000)............................................................................ 22

*Concerned Area Residents for the Env't v. Southview Farm,*
34 F.3d 114 (2d Cir. 1994).................................................................. 9

*Conservation Law Found., Inc. v. EPA,*
No. 1:10-cv-11455-MLW (D. Mass.) ................................................ 30

*Cordiano v. Metacon Gun Club, Inc.,*
575 F.3d 199 (2d Cir. 2009)................................................................ 5

*CTS Corp. v. Waldburger,*
134 S.Ct. 2175 (2014) ........................................................................ 14

*Dague v. City of Burlington,*
935 F.2d 1343 (2d Cir. 1991), *rev'd on other grounds,*
505 U.S. 557 (1992) ............................................................................. 9

*Ecological Rights Found. v. Pac. Gas & Elec. Co.,*
713 F.3d 502 (9th Cir. 2013).............................................................. 11

*Froebel v. Meyer,*
217 F.3d 928 (7th Cir. 2000).............................................................. 27

*Kelley v. United States*,
   618 F. Supp. 1103 (W.D. Mich. 1985) .............................................. 18

*Kelly v. United States*,
   No. 1:79-cv-10199, 1980 U.S. Dist. LEXIS 17772
   (E.D. Mich. Oct. 28, 1980)................................................................. 18

*Lewis v. City of Chi., Ill.*,
   560 U.S. 205 (2010) .......................................................................... 12

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   550 F.3d 778 (9th Cir. 2008)............................................................... 4

*Rapanos v. United States*,
   547 U.S. 715 (2006) ............................................................................ 8

*Reno v. Koray*,
   515 U.S. 50 (1995) ............................................................................ 22

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*,
   541 U.S. 95 (2004) ....................................................................... 8, 10

*Sackett v. EPA*,
   566 U.S. 120 (2012) .......................................................................... 25

*Sierra Club v. Abston Const. Co.*,
   620 F.2d 41 (5th Cir. 1980)............................................................ 9, 10

*Sierra Club v. El Paso Gold Mines, Inc.*,
   421 F.3d 1133 (10th Cir. 2005).......................................................... 9

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .......................................................................... 23

*Tri-Realty Co. v. Ursinus College*,
   No. CIV.A. 11-5885, 2013 WL 6164092 (E.D. Pa. Nov. 21, 2013) .................. 7

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   136 S.Ct. 1807 (2016) ....................................................................... 25

*Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*,
   962 F. Supp. 1312 (D. Or. 1997) .............................................. 13, 18, 25

*United States v. Ortiz,*
   427 F.3d 1278 (10th Cir. 2005)............................................................ 9

*United States v. Plaza Health Labs., Inc.,*
   3 F.3d 643 (2d Cir. 1993)............................................................ 5, 11

*United States v. Velsicol Chem. Corp.,*
   438 F. Supp. 945 (W.D. Tenn. 1976)........................................ 9

*Vill. of Oconomowoc Lake v. Dayton Hudson Corp.,*
   24 F.3d 962 (7th Cir. 1994)........................................................ 19

*Waterkeeper All., Inc. v. EPA,*
   399 F.3d 486 (2d Cir. 2005)...................................................... 19

*Worden v. SunTrust Banks, Inc.,*
   549 F.3d 334 (4th Cir. 2008)..................................................... 12

## Statutes

33 U.S.C. §1251(a) ............................................................................ 21

33 U.S.C. §1251(b) ............................................................................ 21

33 U.S.C. §1254(a)(5) ....................................................................... 12

33 U.S.C. §1311 ................................................................................. 26

33 U.S.C. §1311(a) ........................................................................ 4, 27

33 U.S.C. §1312 ................................................................................. 26

33 U.S.C. §1314(a)(2) ....................................................................... 12

33 U.S.C. §1321(b)(3) ......................................................................... 6

33 U.S.C. §1323(a) .............................................................................. 5

33 U.S.C. §1329(b)(2)(A) ................................................................. 12

33 U.S.C. §1345(a) .............................................................................. 5

33 U.S.C. §1362(12) ............................................................................ 4

33 U.S.C. §1362(14) ............................................................................ 4

iv

33 U.S.C. §1365 ........................................................................ 27

42 U.S.C. §300f ........................................................................ 15

42 U.S.C. §6901. ...................................................................... 14

42 U.S.C. §6903(27) ................................................................. 16

42 U.S.C. §9601. ...................................................................... 15

Va. Code §10.1-2123. ............................................................... 13

Va. Code §62.1-44.19:4. ........................................................... 13

Va. Code §62.1-44.117 ............................................................. 15

Va. Code §62.1-44.118 ............................................................. 15

**Regulations**

40 C.F.R. §122.21 .................................................................... 19

40 C.F.R. §122.41(l)(4)(i) ........................................................ 26

40 C.F.R. §122.41(1)(6)(ii) ...................................................... 26

40 C.F.R. §131.13 ............................................................. 27 n.7

40 C.F.R. §257.90(b)(1) ........................................................... 16

40 C.F.R. §257.90(b)(2) ........................................................... 16

40 C.F.R. §257.98(a) ................................................................ 16

**Federal Register**

56 Fed. Reg. 64,876-01 (Dec. 12, 1991) .................................. 19

66 Fed. Reg. 2960 (Jan. 12, 2001) .......................... 19, 21, 22, 24

68 Fed. Reg. 7176 (Feb. 12, 2003) .......................................... 19

80 Fed. Reg. 21,301 (Apr. 17, 2015) ....................................... 15

82 Fed. Reg. 34,899 (July 27, 2017) ........................................ 21

## *AMICI CURIAE'S* INTEREST[1]

*Amici curiae* represent a broad cross-section of businesses and industries subject to the Clean Water Act ("CWA") and affected by the district court's ruling.

The Virginia Chamber of Commerce is the leading non-partisan business advocacy organization that works in legislative, regulatory, civic and judicial arenas to further long term economic growth in the Commonwealth of Virginia. With over 26,000 members, the Chamber represents virtually every business and industry sector in the Commonwealth.

The Virginia Manufacturers Association is the only statewide association in Virginia exclusively devoted to the more than 5,000 manufacturers in the Commonwealth. The Association's mission includes serving as an advocate for Virginia manufacturers in legislative and regulatory matters, including environmental matters.

The Edison Electric Institute ("EEI") is the national trade association that represents all U.S. investor-owned electric companies. EEI members provide electricity to about 220 million Americans, in all 50 states and the District of Columbia, delivering three-quarters of the nation's electricity. EEI members use

---

[1] This brief was submitted with an accompanying motion for leave to file pursuant to Fed.R.App.P. 29(a)(3). No party's counsel authored this brief in whole or in part. No such counsel or party made a monetary contribution intended to fund this brief's preparation or submission. Only *Amici* made a monetary contribution intended to fund its preparation or submission.

electricity generation, transmission, distribution, and related facilities that require federal and state authorizations, including CWA permits.

The Utility Water Act Group ("UWAG") is a non-profit, unincorporated group of 163 companies and three national trade associations of energy companies: EEI, the National Rural Electric Cooperative Association ("NRECA"), and the American Public Power Association ("APPA"). UWAG's and its trade association members' utility members operate power plants and other facilities that generate, transmit, and distribute electricity to residential, commercial, industrial, and institutional customers in Virginia and nearly every other State. One of UWAG's purposes is to participate on behalf of its members in CWA litigation involving issues of importance to them.

The Utility Solid Waste Activities Group ("USWAG") is an association of over 130 energy industry operating companies and associations including EEI, NRECA, and APPA. USWAG represents the nation's electric and gas industries on regulatory and compliance matters involving the management of solid wastes, including the management and disposal of coal combustion residuals. USWAG's purposes include participation on behalf of its members in litigation regarding the management of coal combustion residuals of importance to them.

*Amici's* broad perspective will aid this Court's understanding of the CWA's text, framework, and legislative history, as well as the burdens the district court's ruling bodes for *Amici's* members and the public broadly.

## ARGUMENT

*Amici* endorse the arguments in Virginia Electric & Power Company's ("Dominion") opening brief. As Dominion explains, groundwater is not navigable water under the CWA. The district court improperly rewrote the CWA to create an exception for groundwater with a hydrological connection to navigable water. It also misapplied the definition of "point source" to Dominion's ash management areas, which are not "confined, discrete conveyances" of pollutants.

As this brief explains, the district court rewrote the CWA in another way as well. It expanded the CWA's prohibition against unpermitted discharges of pollutants from point sources by eliminating the requirement that a point source convey the pollutants to navigable waters. The district court's opinion requires a CWA §402 national pollutant discharge elimination system ("NPDES") permit for every addition of pollutants to navigable waters regardless of how the pollutants get there—plainly contrary to the CWA's clear text and, ironically, weakening federal groundwater protection by displacing the Resource Conservation and Recovery Act. *Amici* submit this brief to supplement Dominion's brief on this point, to discuss additional erroneous aspects of the district court's ruling, and to

3

provide the Court additional understanding of the adverse impacts of the district court's ruling on the NPDES program and the regulated community.

## I. THE DISTRICT COURT MISAPPLIED THE CWA'S BAN ON DISCHARGES OF POLLUTANTS FROM POINT SOURCES

The point source requirement is a defining feature of the NPDES permit program. As this Court has long recognized: "Congress consciously distinguished between point source and nonpoint source discharges, giving EPA authority under the Act to regulate only the former." *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976). *See also, Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 780 (9th Cir. 2008) (the "disparate treatment of discharges from point sources and nonpoint sources is an organizational paradigm of the Act").

The CWA's plain text draws that distinction. An NPDES permit is required for the "discharge of any pollutant." CWA §301, 33 U.S.C. §1311(a). The CWA defines "discharge of any pollutant" as the addition of pollutants to navigable waters from a "point source." *Id.* at §1362(12). Point source is defined as a "discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged." *Id.* at §1362(14).

Read together, these provisions mean an NPDES permit is required only when some discernible, confined and discrete conveyance adds pollutants to navigable waters. A point source must be the conveyance—*i.e.*, the means by which pollutants are transported to and deposited into navigable waters—and the

4

"discharge of pollutants" occurs only at the outfall where that conveyance adds pollutants to navigable waters. *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 224 (2d Cir. 2009) (CWA "requires that pollutants reach navigable waters by a 'discernible, confined and discrete conveyance'"); *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 646 (2d Cir. 1993) (point sources "act as a means" of conveying pollutants to navigable waters).

The CWA's other provisions make this point source requirement even clearer by contrast. They show that when Congress wanted the CWA to apply to the addition of pollutants from more than point sources, it knew how to do so.

For example, Congress sometimes specifically referred to a type of nonpoint source pollution as it did in CWA §313. That provision requires federal departments, agencies and instrumentalities that engage in activities that may result in "the discharge *or runoff* of pollutants" to comply with state and federal environmental laws. 33 U.S.C. §1323(a) (emphasis added).

At other times Congress did not limit a section's application to discharges into navigable water but instead used broad language that imposes liability if the release results in contamination to navigable waters. Section 405, for instance, prohibits the disposal of sewage sludge that "would *result in* any pollutant from such sewage sludge entering the navigable waters." 33 U.S.C. §1345(a) (emphasis

added).  Section 311 prohibits the discharge of oil or hazardous substances which *"may affect"* certain natural resources.  33 U.S.C. §1321(b)(3) (emphasis added).

Congress could have written §402 to mirror these provisions.  It could have written §402 to ban discharges that would result in pollutants entering navigable water or that may affect navigable water.  It chose not to.  Congress instead limited CWA §402's reach to discharges to navigable water from point sources.  That a point source makes a release that eventually "results in" the addition of pollutants to, or "affects," navigable water, therefore, is insufficient to require an NPDES permit.  The point source must deposit pollutants to navigable waters.

The district court overrode these limitations that Congress imposed.  The district court found that arsenic from the ash management areas percolates into groundwater which flows to navigable water.  But just as groundwater is not navigable water, it is not a point source.  The district court did not find groundwater is a point source; appellee has not argued it is; no regulator, including EPA, has said that it is; the facts confirm it is not.  As the district court acknowledged, the location, volume and rate of groundwater flow into the surface waters at issue are unknown.  March 23, 2017 Opinion (Dist. Ct. Docket #195) ("Op.") at 8.  That is the antithesis of a defined, confined and discrete conveyance. *26 Crown Assocs., LLC v. Greater New Haven Reg'l Water Pollution Control Auth.*, No. 3:14-CV-1439, 2017 WL 2960506, at *8 (D. Conn. July 11, 2017)

6

("Absent exceptional proof of something akin to a mythical Styx-like subterranean river, a diffuse medium like ground water for the passive migration of pollutants to navigable waters cannot constitute a 'point source. . . .'"); *Tri-Realty Co. v. Ursinus College,* No. CIV.A. 11-5885, 2013 WL 6164092, at *8 (E.D. Pa. Nov. 21, 2013) ("given its natural physical attributes, groundwater [cannot] fairly be described as a 'discernible, confined and discrete conveyance.'").

Any pollution of the surface waters at issue, in other words, is nonpoint source pollution. The district court's ruling that makes Dominion liable for failing to obtain an NPDES permit for that nonpoint source pollution contravenes the CWA.

In fact, EPA urged adoption of amendments to the Solid Waste Disposal Act after the CWA was enacted precisely because these kinds of waste storage areas are not point sources, and their effects on groundwater and connected surface water are not covered by NPDES permitting. In a report closely contemporaneous with the CWA's adoption, EPA wrote that Congress "seems not to have intended that land disposal facilities are to be included within the point source definition. In fact, the opposite appears to be true." *Report to Congress by the Environmental Protection Agency pursuant to Section 212 of the Solid Waste Disposal Act, as amended,* Serial no. 93-21, 93rd Congress, 2d Sess. (1974) at 19–20 (Addendum Ex. A).

7

EPA further explains on its website that any seepage from areas like ash management areas is nonpoint source pollution. EPA explains there that nonpoint source pollution results from "land runoff, *precipitation*, atmospheric deposition, drainage, *seepage* or hydrologic modification." EPA, *What is Nonpoint Source?* (May 2, 2017) at p.1 (emphasis added) (Addendum Ex. B) (available at *www.epa.gov/nps/what-nonpoint-source*). Nonpoint source pollution, EPA adds, "is caused by rainfall or snowmelt moving over and through the ground. As the runoff moves, it picks up and carries away natural and human-made pollutants, finally depositing them into lakes, rivers, wetlands, coastal waters and ground waters." *Id.*

Nor does the "indirect" discharge rationale discussed in Justice Scalia's plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), apply to Dominion's ash storage areas. As Justice Scalia explained, the CWA may require an NPDES permit for the release of pollutants from a point source that does not directly discharge into navigable waters, but that "pass 'through conveyances' in between" the initial point source and navigable water. *Id.* at 743. For an NPDES permit to be required in that circumstance, however, those intermediate conveyances must themselves be point sources.

The cases *Rapanos* cites confirm this. Each concerned the conveyance of pollutants to navigable waters through a series of point sources. *S. Fla. Water*

*Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 104 (2004) (permit required for pump station discharge through a canal into navigable waters); *United States v. Ortiz*, 427 F.3d 1278, 1281 (10th Cir. 2005) (permit required for an industrial facility toilet discharge to a storm drain into navigable waters); *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141 (10th Cir. 2005) (permit required for a mineshaft discharge through a tunnel to navigable waters); *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 118 (2d Cir. 1994) (permit required for farm vehicle discharge through a swale, pipe, and ditch into navigable waters); *Dague v. City of Burlington*, 935 F.2d 1343, 1354-1355 (2d Cir. 1991) (permit required for landfill seepage discharge through a culvert into navigable waters), *rev'd on other grounds*, 505 U.S. 557 (1992); *United States v. Velsicol Chem. Corp.*, 438 F. Supp. 945, 946-947 (W.D. Tenn. 1976) (permit required for a chemical facility discharge through a municipal storm sewer into navigable waters).

The Fifth Circuit articulated the principle succinctly in *Sierra Club v. Abston Const. Co.*, 620 F.2d 41 (5th Cir. 1980). The plaintiff in that case contended an NPDES permit is required if the "original source" of a pollutant that ends up in surface water is a point source, "regardless of how the pollutant found its way from that original source to the waterway." *Id*. at 44. "Whether or not the law should prohibit such pollution," the court of appeals wrote, "this Act [the CWA] does

9

not." *Id.* Section 402 applies only to pollutants that are delivered to, and put into, navigable water by point sources.

In sum, an interpretation that focuses solely on whether a pollutant originated at some discernable, confined, and discrete source does not comport with the CWA. The Supreme Court made clear in *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004), that CWA §402 does not concern itself with the origin of pollutants added to navigable waters. Its focus is the conveyance that delivers pollutants to navigable waters, and that conveyance must be a point source.

The district court's contrary ruling eliminates any meaningful distinction between point and nonpoint sources, frustrating Congress' will. It converts many nonpoint sources to point sources that require NPDES permits, because much nonpoint source pollution originates from some human-made or human-induced source that puts pollutants on or in the ground that are then transported to navigable waters by rainfall, snowmelt, or percolation to groundwater (*e.g.,* gas that leaks from nozzles at gas stations; rain that percolates through municipal road salt storage yards; irrigation water on golf courses and farm fields; storm water detention basins; septic tanks; vehicles dripping oil on roads). As one court explained:

> [N]on-point source pollution . . . could invariably be reformulated as
> point-source pollution by going up the causal chain to identify the

10

initial point sources of the pollutants that eventually ended up through nonpoint sources to come to rest in navigable waters.

*Crown Assocs.*, 2107 WL 2960506, at *8.

It is not just the addition of pollutants to navigable water via groundwater that would require an NPDES permit under the district court's ruling either. The logic of the district court's opinion applies equally to pollutants that originate from some discernable, confined, discrete source but enter navigable water via uncollected surface runoff, the wind, and deposition through the air. Those are classic types of nonpoint source pollution. That the district court's ruling requires NPDES permits for them confirms the ruling is incorrect. *See Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 508 (9th Cir. 2013) ("most common example of nonpoint source pollution is the residue left on roadways by automobiles") (citation omitted); *Plaza Health Labs.,* 3 F.3d at 654 n.6 ("[Sources] may be point sources when they deposit waste directly into water; . . . [not] when they . . . deposit oil in a driveway, leaving it to be washed into nearby rivers.").

## II.    THE DISTRICT COURT ERRONEOUSLY RELIED ON ONE OF THE CWA'S PURPOSES TO EXCEED §402'S SCOPE

The district court erroneously reasoned that the CWA's goal of protecting the nation's surface waters would be "defeated" unless §402 was construed to require NPDES permits for contaminated groundwater that is hydrologically connected to surface water. Op. at 12. A court cannot rely on a statute's

11

"purposes" to rewrite a statute. *Lewis v. City of Chi., Ill.*, 560 U.S. 205, 215 (2010). The courts' "judicial task is only to determine the meaning of the statute as passed by Congress, not to question the wisdom of the provision enacted." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 347 (4th Cir. 2008). *See also Train*, 545 F.2d at 1373 (this Court held EPA lacks authority to issue regulation limiting suspended solids in uncollected rainfall runoff at construction and material storage sites—a nonpoint source pollution—despite EPA's contention regulation is necessary to further the Act's purpose of protecting surface water).

In addition, the district court expressed an incomplete understanding of the CWA. It incorrectly assumed the only way Congress intended to protect surface water in the CWA was through the NPDES program.

The CWA seeks to protect surface water through two means. One is through the NPDES program. The other is nonpoint source management programs. The CWA requires States to develop, with EPA input and approval, programs to reduce pollutant loadings from nonpoint sources to navigable waters. *E.g.,* 33 U.S.C. §1329(b)(2)(A) (states to establish nonpoint source programs which take into account groundwater quality); §1254(a)(5) (EPA, in cooperation with states, to monitor groundwater quality); §1314(a)(2) (EPA, in consultation with states, to develop information on factors necessary to restore and maintain groundwater quality).

12

Every state has adopted such programs. *See State Contacts for NPS Programs* (EPA)*,* available at *www.epa.gov/nps/state-contacts-nps-programs*. Virginia's is embodied in the Water Quality Monitoring, Information and Restoration Act, Va. Code §62.1-44.19:4 *et seq.,* and the Cooperative Nonpoint Source Pollution Program, Va. Code §10.1-2123 *et seq.  See also* Virginia Nonpoint Source Pollution Management Program: 2016 Annual Nonpoint Source Report (VADEQ 2016), available at *http://www.deq.virginia.gov/ Programs/Water/WaterQualityInformationTMDLs/NonpointSourcePollutionMana gement.aspx.*

Contrary to the district court's belief, therefore, exclusion of hydrologically connected groundwater from NPDES permitting does not "defeat" the CWA's goals.  It merely keeps regulation of contaminated groundwater under the purview of state nonpoint source management programs and other solid waste management regulations, just as Congress intended.

As Dominion's brief shows, Congress was well aware of the relationship between groundwater and surface water when it enacted the CWA, but chose not to require NPDES permits for seepage of pollutants into groundwater.  It rejected any number of proposed amendments that would have extended §402 to groundwater. *Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.,* 962 F. Supp. 1312, 1316–19 (D. Or. 1997) (CWA legislative history discussion).

It thus cannot be said in light of the Act's text, structure and legislative history that NPDES permitting must be construed to encompass hydrologically connected groundwater to preserve Congressional intent. Given Congress' clear intent that NPDES permits are limited to point source discharges to navigable water, the Court should not embrace a contrary position. *CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2185 (2014) (rejection of interpretation based on statute's objective not grounded in the statute's text and structure); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 494 (2d Cir. 2001) ("[T]he CWA balances a welter of consistent and inconsistent goals . . . congressional intent is not served by elevating one policy above the others, particularly where the balance struck in the text is sufficiently clear to point to an answer.").

## III. DISCHARGES TO GROUNDWATER ARE SUBJECT TO MANY OTHER ENVIRONMENTAL PROTECTIONS

The district court wrongly feared that excluding groundwater pollution from NPDES permitting—in faithful adherence to the CWA's text, structure and legislative history—will allow unchecked pollution of groundwater and connected surface waters. Numerous federal environmental programs are designed to protect groundwater pollution and connected surface water. *E.g.*, Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq.*; Safe Drinking Water Act

("SDWA"), 42 U.S.C. §300f *et seq.*; Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 *et seq.*

States too have environmental programs that protect groundwater, including as discussed above, pp. 12-13, EPA-approved nonpoint source programs. These State programs can provide greater regulatory controls to protect groundwater, including adverse effects on connected surface water, than the NPDES program. The NPDES program regulates only the amount and concentration of pollutants released at a point source's outfall, and cannot regulate the upstream activities that generate those pollutants. State nonpoint source programs are broader. They allow States to use diverse tools to regulate activities that generate nonpoint source pollution. Those tools include legislation (such as Virginia's Chesapeake Bay and Virginia Waters Clean-up and Oversight Act of 2006, Va. Code §§62.1-44.117-62.1-44.118), solid waste management programs, land conservation programs, sewage management programs, forestry management, and urban runoff control programs.

And ironically, the district court's ruling weakens protections of groundwater under one of the most important federal environmental programs, RCRA. RCRA regulations provide important federal protections for groundwater in proximity to coal ash landfills and surface impoundments. *See* Coal Combustion Residuals ("CCR") Rule, 80 Fed. Reg. 21,301 (Apr. 17, 2015). Those

regulations subject CCR landfills and surface impoundments to groundwater monitoring and require corrective actions for contaminated groundwater. 40 C.F.R. §257.90(b)(1) & (b)(2); §257.98(a).

The court's ruling eviscerates those protections. This follows from RCRA's definition of "solid waste," which excludes industrial discharges subject to NPDES permitting:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or *industrial discharges which are point sources subject to permits under section 1342 of Title 33*, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended.

42 U.S.C. §6903(27) (emphasis added).

So if Dominion's ash management areas are point sources that require NPDES permits, their releases to ground water—the only "point source" the district court identified—would be subject to NPDES requirements and *categorically excluded* from RCRA regulation. Solid and hazardous waste management programs would be thrown into disarray, as responsibility for protection of groundwater shifts from agencies or departments with experience and responsibility for regulating solid waste to protect both ground and surface waters,

16

to other agencies or departments with a narrow focus on protecting navigable water.

The district court neither acknowledged nor discussed these implications, which upset EPA's just completed major rulemaking designed to more uniformly and restrictively regulate management of CCR at existing and new surface impoundments and new or expanded landfills. EPA specifically assessed the impacts of CCR management facilities on both ground and surface water, and established requirements to protect both. The district court displaced those regulatory requirements for protection of ground and surface water in favor of NPDES permits.

NPDES permits are not designed to provide the same protection as RCRA. In particular, the CWA does not authorize NPDES permit writers to issue permits that protect groundwater. EPA's technology-based limits apply to specific categories of discharges entering navigable water, through defined outfalls. Navigable water  is also the sole focus of water quality standards, which CWA §303 requires States to adopt with EPA oversight. Thus, if discharges to groundwater need an NPDES permit, the permit writer's sole job will be to ensure that the permits achieve technology and water quality-based limits for the affected navigable water. She will lack authority to establish limits that protect groundwater itself as could be done under RCRA and the CCR Rule.

## IV. EPA INTERPRETED CWA §402 NOT TO APPLY TO HYDROLOGICALLY CONNECTED GROUNDWATER

The district court further erred in relying, in part, on two EPA statements in the Federal Register to the effect that NPDES permits are needed for discharges to groundwater with a "direct" hydrological connection to navigable water. Op. at 13. EPA has a long history—both before and after those statements—of declaring that NPDES permits are *not* required for any discharges to groundwater.

That was EPA's position when the CWA was enacted. *See* Opinion, Office of EPA General Counsel (Dec. 13, 1973), reprinted in *Umatilla,* 962 F. Supp. at 1319 (opining that the addition of pollutants into groundwater does not require NPDES permit; no mention of exception for direct hydrologic connection).

That was the Government's position as well when it was sued under the CWA's citizen suit provision for discharges into groundwater from federal facilities. The Government maintained that NPDES permits are *not* required for such discharges. *E.g.*, *Kelley v. United States*, 618 F. Supp. 1103, 1105–06 (W.D. Mich. 1985) (agreeing with Government's position that NPDES permit is not required for discharges into groundwater connected to surface water); *Kelly v. United States*, No. 1:79-cv-10199, 1980 U.S. Dist. LEXIS 17772, at *3 (E.D. Mich. Oct. 28, 1980) (same).

EPA's NPDES regulations too do not require an applicant to provide the information that is necessary if the NPDES program applies to discharges to

18

hydrologically connected groundwater. They do not, for instance, require applicants to identify if their operations result in the addition of pollutants to groundwater. Nor do they require applicants to provide hydrological data that are necessary to establish a direct hydrological connection. *See* 40 C.F.R. §122.21; Application Form 2C—Wastewater Discharge Information (rev. August 1990), (Addendum Ex. C) available at *https://www.epa.gov/npdes/npdes-application-forms*.

The isolated statements that the district court pointed to, in contrast, are not embodied in any regulation and have not been subject to judicial review under the Administrative Procedures Act. The first, in 1991, was an offhand response to a public comment on NPDES permitting on Indian land. 56 Fed. Reg. 64,876-01 (Dec. 12, 1991). *See Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 966 (7th Cir. 1994) (declining to defer to EPA direct hydrological connection statement, holding: "Collateral reference to a problem [in an EPA preamble] is not a satisfactory substitute for focused attention in rule-making or adjudication.").

The other, in 2001, was in connection with a proposed rule for concentrated animal feedlots. 66 Fed. Reg. 2960, 3017 (Jan. 12, 2001). However, EPA eventually rejected the proposal in the face of immense public outcry against it. 68 Fed. Reg. 7176, 7216 (Feb. 12, 2003); *Waterkeeper All., Inc. v. EPA,* 399 F.3d 486, 514–15 (2d Cir. 2005) (recounting rejection of proposal).

EPA never again proposed regulations to extend NPDES permitting to hydrologically connected groundwater, and has continued to say at times that NPDES permits are unnecessary for discharges to groundwater, with no mention of exceptions for groundwater that is hydrologically connected to surface water, as the following examples show:

• In 2011, EPA responded to comments on a final NPDES pesticide general permit. EPA, Response to Public Comments, EPA NPDES Pesticide General Permit (Oct. 31, 2011) (Addendum Ex. D). In response to one comment stating that the permit should "ensure that discharges do not affect groundwater," EPA stated that the "NPDES program … is for the control of discharges to waters of the United States" and that "discharges to groundwater are not regulated under the NPDES program." *Id.* at xxii.

• In 2014, EPA issued a fact sheet regarding three reissued NPDES permits for stormwater discharges from municipal storm sewer systems. In addressing stormwater "discharges to the subsurface," EPA stated that "NPDES permits are applicable for point source discharges to waters of the U.S" and that "discharges to groundwater are not addressed in the NPDES program and as such are not addressed by this permit." EPA, Fact Sheet, Draft General Permits for Stormwater Discharges Systems from Small Municipal Separate Sewer Systems in Massachusetts (Sept. 30, 2014) at 18 (Addendum Ex. E).

•    In 2017, in response to public comments on draft NPDES permits authorizing remediation activity discharges, EPA said "discharges to groundwater are not regulated by the NPDES program," but "*may* be regulated under other discharge permit authorities."  EPA, Response to Public Comments, Permit Nos. MAG910000 and NHG910000 (March 9, 2017) at 7 (Addendum Ex. F) (emphasis in original).

What's more, EPA recently acknowledged the type of analysis underlying its "direct hydrological connection" statements is flawed.  EPA did so in its recent proposal to withdraw its 2015 regulation defining "Waters of the United States (WOTUS)."  82 Fed. Reg. 34,899 (July 27, 2017).  As EPA explained, *id.* at 34,900, the CWA has two co-equal policy goals.  One, in §101(a) of the Act, concerns the restoration and maintenance of the nation's waters.  33 U.S.C. §1251(a).  The other, in §101(b), seeks to preserve the States' primary responsibility and right to prevent, reduce, and eliminate pollution.  33 U.S.C. §1251(b).  Its WOTUS regulation must be withdrawn, EPA explained, because the agency failed to consider "the meaning and importance" of this second goal in formulating the WOTUS definition.  82 Fed. Reg. at 34,902.

EPA's "direct hydrological connection" statements suffer the same defect.  EPA provided the analysis supporting that position in its 2001 proposed rulemaking.  66 Fed. Reg. 2960, 3015–17 (Jan. 12, 2001).  That analysis does not

mention §101(b), much less analyze the meaning and importance of this statutory provision. EPA's interpretation suffers the same fatal flaw that caused EPA to propose withdrawal of its WOTUS interpretation.

That deficiency is in addition to the inconsistency that plagues EPA's analysis. EPA differentiated between "direct" and "general" hydrological connections. Discharges into groundwater with the former require an NPDES permit, EPA said, while discharges into the latter do not. *Id.* at 3017. EPA, however, did not explain the difference between these two types of hydrologic connections. Nor did it explain why they should be treated differently. CWA §402 has no exceptions to the prohibition on point source discharges to navigable water without a permit. The addition of pollutants to waters of the United States via a "general" hydrologic connection, therefore, should be no different for NPDES permitting than an addition via a "direct" connection. Yet with no explanation EPA said one requires an NPDES permit and the other does not.

To give deference to the "direct hydrological connection" statements in these circumstances would be to sanction stealth rulemaking. Those statements are not entitled to *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576 (2000) (agency interpretations that are not embodied in regulations or that otherwise lack the force of law are not entitled to *Chevron* deference); *Reno v. Koray*, 515 U.S. 50, 61 (1995) (internal agency guideline, that is not "subject to the

22

rigors of the Administrative Procedure Act, including public notice and comment," does not receive *Chevron* deference).  They also lack the power to persuade, given their invalid reasoning and EPA's inconsistent statements and actions.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (persuasiveness of an agency's interpretation depends on "the validity of its reasoning" and the "consistency" of the agency's pronouncements).

What the district court should have relied on, if anything, is EPA's original interpretation that NPDES permitting does not extend to groundwater.  EPA's contemporaneous understanding is entitled to "great weight" and should have guided the district court.  *Bankamerica Corp. v. U.S*, 462 U.S. 122, 130 (1983) ("great weight" given to agency's contemporaneous interpretation of statute).

## V.    THE DISTRICT COURT'S DECISION UNFAIRLY BURDENS THE REGULATED PUBLIC

The district court's interpretation imposes substantial costs on the regulated public.  Congress, not the courts, should make the policy decision whether those burdens are warranted.

### A.    Dischargers lack certainty whether they need NPDES permits.

The district court's decision creates great uncertainty whether a discharge to groundwater requires an NPDES permit.  The dividing line between a "direct" connection (which requires an NPDES permit) and a "general" one (which does not) is undefined.  The district court did not define or explain the difference.  Nor

has EPA. EPA's regulations are silent on it. EPA has issued no guidance memos or other official agency documents explaining how to differentiate between direct and general hydrological connections.

The only indication EPA has given is the bland observation that a direct connection is a fact-specific inquiry, based on the time and distance of the groundwater flow. 66 Fed. Reg. at 3017. That generalized statement is unhelpful. It does not explain to the public, permitting authorities, and courts how to use those factors to differentiate a direct from a general connection. What distance is close enough to qualify as a direct connection? How much time is fast enough to qualify? What volume is enough? EPA and the district court provide no explanation.

Businesses, localities, and individuals thus have no certainty whether an NPDES permit is required for specific discharges to groundwater. They are left guessing whether they must apply for NPDES permits. Even if permitting authorities agree groundwater into which a discharge occurs lacks a direct hydrological connection, that determination could be second guessed in a citizen suit. That suit could be brought years later—as happened in this case—after the discharger has spent millions of dollars building and operating its facilities in reliance on the permitting authorities' decision that an NPDES permit is unnecessary.

The district court's decision will, as one court stated in rejecting hydrologically connected groundwater as a basis for NPDES permitting, "add a new level of uncertainty . . . and would expose potentially [millions] of . . . [sources] to . . . litigation and legal liability if they . . . happen[] to make the 'wrong' choice. . . ." *Umatilla*, 962 F. Supp. at 1320.

Supreme Court justices have bemoaned the regulatory uncertainty caused by the CWA definition of "waters of the United States." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S.Ct. 1807, 1816-17 (2016) ("the reach and systemic consequences of the [CWA] remain a cause for concern") (Kennedy, J., concurring); *Sackett v. EPA*, 566 U.S. 120, 132-33 (2012) ("The reach of the [CWA] is notoriously unclear;" no "clarity and predictability.") (Alito, J., concurring). This Court should not compound that uncertainty by adopting the district court's hydrological connection theory.

That uncertainty would create disincentives for critical private and public infrastructure. Groundwater recharge systems are used to convey stormwater or recycled wastewater (which contain "pollutants") into shallow subsurface aquifers to augment public water supplies, create seawater intrusion barriers, and eliminate surface outfalls, among other benefits.[2] This infrastructure includes spreading

---

[2] 2012 Guidelines for Water Reuse at 4-25 (EPA/600/R-12-618) (Sept. 2012), available at *https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=253411.*

basins,[3] natural treatment systems,[4] and injection wells,[5] among others. It also includes green infrastructure, which is used to retain, percolate and infiltrate stormwater into the ground to minimize discharges of municipal stormwater and combined sewer overflows.[6] These types of infrastructure provide multiple benefits to the public, including improving water quality. The district court's ruling creates uncertainty whether NPDES permit requirements apply and will likely impede these types of beneficial infrastructure.

### B.    NPDES permit holders could be sanctioned through no fault of their own.

The regulatory uncertainty the district court's decision bodes does not end with issuance of an NPDES permit. The CWA and EPA's NPDES regulations impose effluent limits on the amount and concentration of pollutants in a permittee's discharges. 33 U.S.C. §§1311, 1312. They also require the permittee to monitor the pollutants it discharges and to report any violation of effluent limits. *See* 40 C.F.R. §122.41(l)(4)(i) (requiring regular discharge monitoring reports); 122.41(l)(6)(ii) (requiring reporting of bypasses or upsets exceeding effluent limits within 24 hours of discovery). Exceedances of the limits, and failure to obtain and

---

[3] *E.g.*, *http://obgma.com/san-antonio-creek-spreading-grounds/.*
[4] *E.g.*, *http://www.irwd.com/services/natural-treatment-system.*
[5] *E.g.*, *https://www.ocwd.com/what-we-do/water-reuse/.*
[6] *See generally*, EPA, Green Infrastructure, *https://www.epa.gov/green-infrastructure.*

26

report the associated discharge data, are violations subject to enforcement actions by permitting authorities and citizen suits.  33 U.S.C. §§1311(a), 1365.

The effluent limits and monitoring obligations are end of pipe requirements that are specific to individual outfalls.  *Froebel v. Meyer,* 217 F.3d 928, 937–938 (7th Cir. 2000).  They require knowing the precise location where pollutants enter jurisdictional water and the ability to measure and test the flow there, as can be done at the outfall of a pipe.  This is why the NPDES permit application requires detailed information on the location of the outfall (longitude and latitude in degrees, minutes and seconds), the flow rate and types of wastewaters proposed to be discharged, the pollutants within the wastewaters, and the components of the wastewater treatment system applicable to each wastewater stream.  *See* Application Form 2C—Wastewater Discharge Information (rev. August 1990) (Addendum Ex. C), available at *https://www.epa.gov/npdes/npdes-application-forms.*[7]

It is seldom the case that groundwater migration can be pinpointed and described to such a degree.  As in this case, it is not always possible to identify where groundwater enters surface waters.  That is especially true with diffuse and

_____

[7]  Although compliance with water quality-based effluent limits can be measured after accounting for a "mixing zone" within the receiving waterbody—if applicable state law provides for mixing zones and the permit explicitly recognizes a mixing zone—the limits generally apply at the point of discharge.  40 C.F.R. §131.13; EPA, *Water Quality Standards Handbook,* Sec. 5.1 (updated 2014) available at *https://www.epa.gov/wqs-tech/water-quality-standards-handbook.*

haphazard flow, where no specific interface can be pinpointed. The velocity and volume of groundwater flow also can vary based on numerous factors such as the amount of precipitation and discharges by others into the water table. There even can be reverse exchange of flows, where surface water flows into groundwater.

That complex hydrology confounds the application and enforcement of NPDES effluent limits and monitoring requirements. How can a permittee comply with effluent limits if it does not know where the groundwater into which it discharges enters surface water? How can it monitor the amount and concentration of pollutants entering jurisdictional water if it cannot identify or access where the groundwater enters? What happens if the interface's location changes?

Permittees authorized to discharge into groundwater would thus perpetually face the threat of accused violations, crippling fines, and expensive remedies for permit violations that they could not prevent because of the complexities of groundwater hydrology. Compounding the concern is pollutants from other sources in the groundwater, whether discharged from other sources on the surface or naturally occurring as water seeps through rocks. The amount of those constituents, and the relative contributions, will vary over time based on a host of factors outside the permittee's control. Yet the permittee could be held to have exceeded its effluent limits, and fined by the EPA and the courts, when it is not responsible for the exceedance and did nothing wrong.

28

## C.  Businesses and localities that relied on EPA will be penalized.

For decades, EPA has encouraged industries and localities to use storm water, process water and wastewater management and treatment methods—such as holding ponds and septic systems—that cause effluent to enter groundwater.  EPA promotes those processes as environmentally friendly water and waste disposal methods.  *See* EPA, National Management Measures to Control Nonpoint Source Pollution from Urban Areas, Management Measure 5 (Nov. 2005) (Addendum Ex. G); EPA, Guidelines for Water Reuse (EPA/600/R-12/618) (2012) (Addendum Ex. H).

Industries and localities did as EPA advised.  Industrial facilities have spent untold sums building those types of management and treatment systems and basing their operations around them.  Localities developed publicly owned water and wastewater systems, on which businesses and homes in their communities rely, employing those systems.  Unlined wastewater ponds are ubiquitous and are commonly used by industries and localities to store water as part of their wastewater treatment systems.

EPA has not required NPDES permits for nonpoint source discharges from those systems.  But now businesses and localities face crippling costs in penalties and remedies in citizen suits for doing precisely what EPA encouraged.

29

Homeowners too will be impacted. Millions of homes use septic tanks. Many of those tanks discharge into groundwater that is hydrologically connected to surface water such as nearby creeks or streams. The district court's reading of the CWA applies equally to them as to industrial operations. Indeed, one citizen suit already has been brought to try to require NPDES permits for all septic tanks in Cape Cod. *Conservation Law Found., Inc. v. EPA*, No. 1:10-cv-11455-MLW (D. Mass.).

## CONCLUSION

The Court should reverse the district court's judgment. The district court did not faithfully apply the CWA. Its decision will have significant adverse consequences that Congress did not want.

Respectfully submitted,

/s/ Michael R. Shebelskie

Kristy A. N. Bulleit
Hunton & Williams LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037-1701
(202) 955-1500
kbulleit@hunton.com

Michael R. Shebelskie
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200
mshebelskie@hunton.com

30

Counsel for *Amici Curiae*
Virginia Chamber of Commerce,
Virginia Manufacturers Association,
Edison Electric Institute, and
Utility Water Act Group



*/s/ John F. Cooney*
Douglas H. Green
John F. Cooney
Margaret K. Fawal
Venable LLP
600 Massachusetts Ave.
Washington, DC 20001
(202) 344-4000
jfcooney@venable.com

Counsel for *Amicus Curiae*
Utility Solid Waste Activities Group

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. 17-1895(L), 17-1952  **Caption:** Sierra Club v. Virginia Electric & Power Company d/b/a Dominion Energy Virginia

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

> [✓] this brief or other document contains _____6,483_____ [state number of] words

> [ ] this brief uses monospaced type and contains _____ [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

> [✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 _____ [identify word processing program] in 14 point Times New Roman font _____ [identify font size and type style]; **or**

> [ ] this brief or other document has been prepared in a monospaced typeface using _____ [identify word processing program] in _____ [identify font size and type style].

(s) Michael R. Shebelskie _____

Party Name Virginia Chamber of Commerce et al.

Dated: Sept. 20, 2017 _____

32

## CERTIFICATE OF SERVICE

I, Michael R. Shebelskie, hereby certify that on September 20, 2017, the foregoing document was electronically filed with the Clerk of the Court for the U.S. Court Appeals for the Fourth Circuit using the appellate CM/ECF system. Registered CM/ECF users participating in the case will be served by the appellate CM/ECF system.

/s/ Michael R. Shebelskie

Counsel for *Amici Curiae*
Virginia Chamber of Commerce,
Virginia Manufacturers Association,
Edison Electric Institute, and
Utility Water Act Group